**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MACK WELDON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:23-cv-710-CWB** |
| | ) | |
| **AMAZON.COM, INC., et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

Mack Weldon is seeking to recover for injuries and damages arising out of an August 2023 motor vehicle accident. (*See* Doc. 47). The alleged at-fault driver is Arnold Edwards. (*Id.*). Weldon seeks to impose liability against both Edwards and multiple corporate entities for whom Edwards allegedly was driving when the accident occurred. (*Id.*).

Transone Logistics, LLC and various Amazon-related entities have requested an entry of summary judgment in their favor. (*See* Docs. 100 & 107).[1] The central summary judgment issue is whether vicarious liability can be imposed under a common law theory of respondeat superior. The summary judgment arguments have been briefed at length and are ripe for determination. (*See* Docs. 103, 104, 106, 114, & 118). As set out below, the court finds that summary judgment is due to be granted in favor of Transone but denied in favor of the Amazon Defendants.[2]

---

[1] Neither Edwards nor his alleged direct employer—Right Path Logistics, LLC—has moved for summary judgment.

[2] The "Amazon Defendants" as referred to collectively herein consist of Amazon.com, Inc., Amazon.com, LLC, Amazon.com Services, LLC, and Amazon Logistics, Inc.

## II. Procedural Background

Weldon initiated this action on December 8, 2023 against Edwards, Right Path, and the Amazon Defendants. (*See* Doc. 1). After being directed to submit a more definite statement of his claim (*see* Doc. 31), Weldon filed an Amended Complaint on April 1, 2024 that omitted his wantonness, entrustment, and hiring/retention/supervision/maintenance claims (*see* Doc. 35). Weldon later filed a Second Amended Complaint on September 4, 2024 to name Transone as an additional defendant. (*See* Doc. 47).

The core allegation is that the underlying motor vehicle accident was the direct result of Edwards's negligence. (*Id*. at p. 4, Count One). As to the entity defendants, Weldon asserts that Edwards "was an employee, servant, or agent of Right Path, Transone and/or Amazon and operating the Amazon delivery truck in the line and scope of his employment for Right Path, Transone and/or Amazon." (*Id.* at p. 5, ¶ 25; *see also id*. at ¶ 26: "Right Path and Edwards were agents of Amazon and/or Transone and Defendant Edwards was operating a … truck controlled by Amazon and/or Transone."). All of the defendants have denied that Weldon is entitled to relief, (*see* Docs. 49, 50, 53), and Transone and the Amazon Defendants further have denied that Edwards was acting on their behalf (*see* Doc. 50 at p. 5, ¶¶ 25-26 & Doc. 53 at p. 3, ¶¶ 25-26).

## III. Jurisdiction and Venue

A complete diversity of citizenship exists between Weldon (*see* Doc. 27) and each of the defendants (*see* Docs. 28, 29, 30, & 122). The court further finds that the amount in controversy at all times has more likely than not exceeded $75,000.00 exclusive of interest and costs. (*See* Doc. 1 at p. 2, ¶ 5; Doc. 35 at p. 2, ¶ 5; Doc. 47 at p. 2, ¶ 6). Subject matter jurisdiction thus exists pursuant to 28 U.S.C. § 1332(a)(1). Neither personal jurisdiction nor venue has been contested, and the record supports both. *See* 28 U.S.C. § 1391; *see also* FED. R. CIV. P. 4(k)(1)(A).

## IV. Legal Standard

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. … [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citation omitted).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That responsibility may be satisfied by identifying portions of the record that negate an essential element of the plaintiff's claim. *Id.* Alternatively, a movant who does not have a trial burden of production may show that the nonmoving party "cannot produce admissible evidence to support [a] fact." Fed. R. Civ. P. 56(c)(1)(B); *see also* advisory committee's note ("[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."); *Celotex*, 477 U.S. at 322-23. Under either scenario, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists as to each element of the underlying claims. *See id.* at 324; *see also* Fed. R. Civ. P. 56(c)(1).

To establish a genuine dispute of material fact, the nonmoving party must produce such evidence as would be sufficient for a reasonable trier of fact to return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) ("Once the moving party makes the required showing, the burden shifts to the non-moving party to rebut that showing

by producing affidavits or other relevant and admissible evidence beyond the pleadings.”). When evaluating whether a genuine dispute of material fact exists, the court must view all evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant’s favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Nonetheless, “[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.” *Scott v. Harris*, 550 U.S. 372, 380 (2007). So too is it well settled that “inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.” *Poer v. Jefferson Cnty. Comm’n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (citation omitted); *see also Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (“[A]n inference based on speculation and conjecture is not reasonable.” (citation omitted)).

## V. Factual Background[3]

In early 2023, Edwards was in need of work and was put in contact with Mark Williams. (Doc. 107-3 at p. 4, depo. pp. 10-12). Williams in turn allowed Edwards to drive a box truck for his small motor carrier company, Right Path Logistics, LLC. (*Id.* at pp. 4-5, 38, depo. pp. 12-13, 147). The work performed by Edwards for Right Path included deliveries for Transone under a “Transportation Agent-Carrier Agreement.” (Doc. 100-3; Doc. 107-1 at p. 16, depo. p. 57). And all such deliveries involved products being delivered under a separate contractual agreement between Transone and Amazon. (Doc. 107-1 at pp. 5, 10, depo. pp. 14-15, 35-36; Doc. 114-4; Doc. 114-5; Doc. 107-4 at pp. 16-17, depo. pp. 56-57).

---

[3] The facts as stated herein are taken from the evidentiary exhibits attached to the parties’ summary judgment filings, reflect the only facts deemed material to a proper resolution of the summary judgment issues, and have been construed most favorably to Weldon as the non-movant.

The Transone/Right Path agreement purported to set out a relationship wherein Transone would act as a broker to arrange for deliveries and Right Path would provide the delivery services as an independent contractor:

> **Section 1**. **Transportation Services**. (a) Agent in its sole discretion will direct cargo to Carrier from time to time for transportation by Carrier. … Carrier's service shall be provided at its own expense and under its entire control as an independent contractor to Agent.

(Doc. 100-3 at p. 3);

> **Section 7**. **Independent Contractor Relationship**. The parties intend that an independent contractor relationship will be created by this Agreement … .

(*Id*. at p. 6). Under the agreement, Transone expressly disclaimed any right of control over how Right Path carried out its obligations:

> Agent does not control, or have the right to control the means, methods, day-to-day operations, or any issues regarding the specifics of driver conduct.

(*Id*. at p. 3, § 1(a));

> Carrier shall have exclusive control and direction of the equipment and vehicles … .

(*Id*. at § 1(b)); and

> Agent is interested only in the results of Carrier's work and shall not exercise any control over the conduct or supervision of the work or the means of Carrier's performance.

(*Id*. at p. 6, § 7). The agreement placed expenses associated with the delivery services upon Right Path, including "fuel, supplies, labor, licenses, permits and tolls" (*id*. at p. 3, § 1(b)), "all licenses and permits … and … tariffs" (*id*. at § 1(c)), "any and all taxes, together with penalties, fines or interest thereon" (*id*. at p. 5, § 4(b)), "insurance" (*id*. at § 5), and "contributions … imposed pursuant to unemployment insurance, social security, income tax, workers' compensation or any other similar statute" (*id*. at p. 6, § 7). Right Path also was required to "maintain a safety program for its drivers." (*Id*. at p. 4, § 1(f)). However, Transone retained a right of notice as to "any

likelihood of delay or of any incident or circumstances that will prevent or delay pick up or delivery to the customer" (*id.* at p. 3, § 1(a)), to have the driver safety program independently audited (*id.* at p. 4, § 1(f)), and to prescribe minimum limits and other insurance parameters (*id.* at p. 5, § 5(a)). Transone additionally imposed certain service and security expectations. (*Id.* at p. 2).

The "Amazon Relay Carrier Terms of Service" between the Amazon Defendants and Transone similarly purported to set out an independent contractor relationship:

> 1. <u>The Services</u>. At Amazon's request, your company will provide transportation services, including receiving, loading, storing, transporting, delivering, unloading, and related services (collectively, the "<u>Services</u>") in accordance with this Agreement. … Your company can accept or reject any opportunity offered by Amazon. …
>
> 2. <u>Independent Contractor Relationship</u>. Your company is an independent contractor of Amazon. Your company has exclusive responsibility for its employees, contractors, subcontractors, agents, and representatives ("<u>Personnel</u>") and exclusive control over compensation, hours, and working conditions of its Personnel. Your company has the exclusive right to hire, engage, transfer, promote, discipline, discharge, and adjust grievances with its Personnel. Your company's Personnel are not eligible for any employee benefits available to employees of Amazon. Neither your company nor any of its Personnel has any authority to bind Amazon to any agreement or obligation.

(Doc. 114-5 at pp. 1-2). The "Amazon Relay Carrier Terms of Service" combined with the "Amazon Relay Program Policies Overview" to form the "Amazon Relay Carrier Agreement." (Doc. 114-6). Similar to the Transone/Right Path agreement, the Amazon/Transone agreement required Transone to "promptly notify Amazon of any accident or event that impairs the safety of or delays delivery of any shipment" (Doc. 114-5 at p. 2, § 4(b)(ix)), pay certain taxes and fees (*id.* at p. 4, § 9), and maintain specified levels of insurance (Doc. 114-6 at p. 10, § V). But the Amazon/Transone agreement also mandated driver use of a "Relay Mobile Application" that would provide and capture specific driving data:

> Drivers are expected to use and leave running at all times the Relay mobile application when performing Services. Drivers are required to (i) dispatch themselves in the Relay mobile application before the scheduled arrival time by clicking "Begin Work," (ii) keep their location sharing as "Always Allow," and (iii) complete all "events" in the application flow for a Trip in order to earn a Relay mobile application use score for such Trip.

(Doc. 114-6 at pp. 3-4);

> C. Required Technology. Amazon may require your company to use various transportation management systems and mobile technologies (e.g. Relay technology, phone, text, SMS, mobile applications and telematics devices) (collectively, "Required Technology") when performing Services. Amazon may collect personally identifying, location, or other data through this Required Technology, which will permit Amazon to identify the location of a shipment including Carrier Equipment or Personnel associated with such shipment. Your company's failure to use the Required Technology requested by Amazon at any time, will negatively affect your company's performance scores. YOUR COMPANY HEREBY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST AMAZON ARISING OUT OF OR RELATED TO AMAZON'S USE OF SUCH REQUIRED TECHNOLOGY WHETHER ARISING OUT OF NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR OTHERWISE.

(*Id*. at p. 9, § IV.C.); and

> b. Data Collection and Use. You acknowledge that data or other information will be collected or generated as your company and its Personnel provide the Services. That information or data may be generated and held by you, your Personnel or a third party service provider you work with (such as your telematics or payroll provider), or may be generated and held by Amazon through use of mobile technology (including phone, text, SMS, or mobile applications), a website, or a telematics or e-logging device by you or your Personnel. Together this data is referred to as "Collected Data". The Collected Data may include the geo-location of your company's Personnel, and related tracking data, including location, movements, speed of travel, and personally identifiable information of your company's Personnel. It may also include your company's Records. To the extent it is not already in Amazon's possession, you will provide us with any and all Collected Data upon our request. Certain types of Collected Data may be collected and stored by third parties, and your company authorizes any third party with access to Collected Data to provide that Collected Data to Amazon. Your company consents to Amazon's collection and use of Collected Data and agrees to obtain any consents from its Personnel or other third parties to enable us to collect and use Collected Data without restriction. Your company agrees that Amazon owns all Collected Data and that we may use Collected Data and share Collected Data with third parties in our discretion. Your company waives and releases Amazon from

> all claims arising out of or in any way related to our collection, use, or sharing of Collected Data.

(Doc. 114-5 at p. 6, § 12.b.). The Amazon/Transone agreement additionally imposed the following conditions on driving:

> 1. On-Road Safety Standards. While performing Services, your company must meet the following requirements:
>
> a. Comply with all applicable Law, including, but not limited to, those Laws pertaining to motor vehicle operation, health, and safety;
>
> b. In the event of a vehicular, safety or any other type of incident (examples include, but are not limited to, fatalities, injuries, damage to vehicles that requires a tow, assault, robbery, theft, physical or verbal threats or harassment, property damage, etc.), (x) ensure that your company's Personnel performing Services is safe, (y) call 9-1-1 in the case of an emergency, and (z) immediately notify Amazon (regardless of severity or fault), by requesting a "call back" through the Support Center tab on the Relay Portal with 24 hours; and
>
> c. Check all planned routes against commercial navigation technology prior to departure and drive only on roads that permit commercial vehicles.
>
> 2. Safety and Compliance Training. At any time, and in its sole discretion, Amazon may require that your company and/or its Personnel complete safety training courses and/or trainings specific to working at Amazon facilities or with Amazon technology designated by Amazon to maintain its eligibility to participate in the Program.

(Doc. 114-6 at p. 5, § II.A.).

On the morning of August 16, 2023, Edwards was driving a Right Path box truck after picking up a load of packages at an Amazon facility near his home in Georgia. (Doc. 107-3 at pp. 5-6, depo. pp. 15-17). Between his delivery stops in Alabama, Edwards was involved in an accident on Alabama Highway 14 in rural Elmore County. (*Id.* at p. 14, depo. p. 50; Doc. 104-1). Weldon contends that Edwards "crossed [the] center line of the highway and struck [his] pick-up truck causing it to spin off the highway and strike a tree." (Doc. 47 at p. 3, ¶ 16). Edwards denies leaving his lane or being at fault. (Doc. 107-3 at pp. 21-22, depo. pp. 78-82).

## VI. Discussion

The court construes Count Two of the Second Amended Complaint as asserting a claim against both Transone and Amazon under a theory of respondeat superior for Edwards's alleged negligence in causing the August 16, 2026 accident. "[U]nder the doctrine of respondeat superior a principal is vicariously liable for the torts of its agent if the tortious acts are committed within the line and scope of the agent's employment." *Bain v. Colbert Cnty. Nw. Ala. Health Care Auth.*, 233 So. 3d 945, 955 (Ala. 2017) (emphasis omitted) (quoting *Martin v. Goodies Distrib.*, 695 So. 2d 1175, 1177 (Ala. 1997)). "On the other hand, 'a party is ordinarily not liable for the tortious act of his independent contractor.'" *Id.* "To determine if a person is the servant or employee of another, rather than an independent contractor, we look at 'whether the entity for whom the work is being performed has reserved the right of control over the means by which the work is done.'" *Donaldson v. Country Mut. Ins. Co.*, 291 So. 3d 1172, 1175 (Ala. 2019) (quoting *Shaw v. C.B. & E., Inc.*, 630 So. 2d 401, 403 (Ala. 1993)). "It is the reserved right of control, and not the actual exercise of such control, that governs the relationship." *Id.*[4]

### A. Transone

Transone contends that summary judgment must be entered in its favor because "Weldon cannot demonstrate that there existed an agency relationship between Transone and Right Path or Edwards" (Doc. 100-1 at p. 9), *i.e.*, "that there are no facts he can point to that Transone had any responsibility or control over Edwards's operation of the box truck" (Doc. 106 at p. 3). Although

[4] "A federal court sitting in diversity jurisdiction applies the substantive law of the forum state, which, in this case, is Alabama." *J & M Assocs., Inc. v. Romero*, 488 F. App'x 373, 376 (11th Cir. 2012) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." (citing *Erie*, 304 U.S. at 78)). Here, all parties agree that Alabama substantive law controls.

countering that summary judgment is inappropriate, Weldon properly frames the court's inquiry as "whether Transone actually exercised control and/or reserved the right of control over the manner of Edwards's performance." (Doc. 103 at p. 7).

As previously stated, the contractual agreement between Transone and Right Path clearly defined the relationship as broker and independent contractor. (*See* Doc. 100-3). Certainly mere labels are not conclusive of the issue, *see Donaldson*, 291 So. 3d at 1175, but the court finds the parties' characterization to be supported by the record evidence as a whole, *see id*. at 1175-76 (explaining that "each case must depend on its own facts, and all features of the relationship are considered together" (citation modified)).

Particularly significant are the following undisputed facts:

- that Right Path offered employment to Edwards (Doc. 107-3 at p. 42, depo p. 162);
- that Right Path took Edwards to obtain his required physical examination (*id*. at pp. 7, 28, depo. pp. 23, 106);
- that Right Path required Edwards to perform a daily inspection on the box truck (*id*. at p. 36, depo. p. 137);
- that Edwards notified Right Path of any maintenance needs (*id*. at p. 36, depo. p. 138);
- that Edwards received a flat salary from Right Path (*id*. at p. 15, depo. p. 56);
- that Edwards never submitted an application with Transone (*id*. at p. 42, depo. p. 161);
- that Edwards signed no agreement with Transone and never met anyone from Transone (*id*. at p. 39, depo. p. 150);
- that Edwards received no direct compensation/benefits from Transone (*id*. at pp. 39, 42, depo. pp. 149, 161);
- that Edwards received no training from Transone (*id*. at p. 37, depo. p. 143); and
- that Right Path/Edwards had the right to reject an assignment from Transone (*id*. at p. 13, depo. p. 47).

(*See also* Doc. 107-1 at pp. 5-6, 9, 13-15, 20, depo. pp. 15, 20, 30, 48-49, 52-53, 55, 73, 76).

Weldon focuses on testimony by Transone that it assisted Edwards in obtaining an ID badge for entry into Amazon facilities and setting up an account on the Amazon app, that Transone would monitor Edwards's real-time status in delivering the Amazon loads, and that Edwards was required to communicate certain information to Transone about the deliveries. (*See* Doc. 103 at pp. 2-6). There is evidence to support those assertions. (Doc. 100-3 at p. 9; Doc. 107-3 at pp. 13-14, 33, 39-40, 42, depo. pp. 46-49, 127-28, 152-54, 162; Doc. 107-1 at pp. 11-13, 16, 18-19, depo. pp. 40-44, 47, 57-60, 66-70). But the conduct relied upon by Weldon fits more appropriately beneath the umbrella of ensuring that the deliveries were performed—not control over the day-to-day means and methods of how those deliveries were carried out. *See Donaldson*, 291 So. 3d at 1176-77 ("[T]he one for whom the work is done may reserve the right to supervise the one doing the work, for the purpose of determining if the one doing the work is performing in conformity with the contract, without converting the relationship into that of master-servant." (quoting *Shaw*, 630 So. 2d at 403)); *Ex parte Union Camp Corp*., 816 So. 2d 1039, 1042 (Ala. 2001) ("Control is not established if the asserted [principal] retains the right to supervise the asserted [agent] merely to determine if the [agent] performs in conformity with the contract." (citations modified)).

The most problematic evidence for the court comes from the cover page of the Transone/ Right Path agreement:

> **Service:** We expect you to keep your commitment to servicing our freight on time:
>
> - If you cannot meet the service requirements for a given shipment you should not accept the load. Our customers expect the best service out of us, as we expect the same from our carriers.
> - If you are running behind or will miss service for any reason we expect immediate notification.
> - Depending on the situation, loads can be day definite or a time specific appointment.
> - Service failure discussions will be performed monthly. Depending

on the severity, we will request a corrective action plan immediately following the service incident.

**Security:** Keep freight safe and secure at all times

- Never leave the load unattended.
- Trailer should be sealed.
- Travel 200 miles before making first stop.
- Truck should be fueled prior to pickup.
- Put the back doors of trailer against a wall or another truck when not driving.
- Safe havens (secure facilities) should be used whenever possible.
- TransOne Logistics, LLC should be made aware if any load has to be stopped for an emergency.
- For any security breach, theft or other security matter we are to be notified immediately.
- We have corporate security that can act immediately upon notification of an incident. The quicker we are made aware, the better chance we will have at recovery.
- Notify agent at **TransOnellc@gmail.com** then notify the account manager you are working with.

(Doc. 100-3). However, when viewed in conjunction with the contractual agreement as a whole, along with the totality of sworn testimony from Transone and Edwards, the cover page contents merely reflect generalized expectations and suggestions for safe and timely deliveries without sufficient teeth to elevate Transone's involvement to the level of driver control as opposed to "a mere right to determine if the person claimed to be an agent is conforming to the requirements of a contract." *Malmberg v. Am. Honda Motor Co.*, 644 So. 2d 888, 890 (Ala. 1994). Nor do requirements to keep Transone apprised of delivery status equate to a right of driver control. Transone simply had no input on the "how"—such as the equipment to be used, the routes to be taken, or the driver to be assigned—so as to create a genuine dispute of material fact.[5]

[5] To the extent Weldon points to evidence that Transone held Edwards out to Amazon as its own employee (*see* Doc. 103 at p. 8 & Doc. 104-4), the court notes that any theory of "apparent agency" requires reliance by the injured party. *See Bain*, 233 So. 3d at 956 ("[T]here must be a reliance on the part of the injured person before liability can be engrafted through the doctrine of respondeat superior, by estoppel, on the master." (citation modified)).

**B. Amazon Defendants**

The analysis of the Amazon Defendants' request for summary judgment is guided by the same general principles—as the Amazon Defendants contend that "there is no genuine dispute of material fact as to there being an agency relationship nor control of the Right Path driver by Amazon." (Doc. 107 at p. 1; *see also id*. at pp. 6-10).[6]

The Amazon Defendants rely in large measure on the roles played by Right Path and Transone in connection with Edwards's driving—pointing out that Weldon acknowledges that "Transone personally enrolled Edwards in its system, monitored his live GPS location, served as his contact to accept or refuse loads, received notification of the wreck directly from Edwards, and held him out to Amazon as a Transone employee" and contrasting that Weldon "does not allege that any Amazon employee spoke to Edwards until he was involved in an accident in a Right Path vehicle." (*Id*. at pp. 7-8 (quoting Doc. 103 at p. 10)). And the Amazon Defendants point to a variety of factual evidence that it contends would be insufficient to create a genuine dispute of material fact on its alleged right of control over Edwards's driving. (*Id*. at pp. 8-9). In short, the Amazon Defendants' position is that "while Amazon may track its assets, there is no evidence to establish any control of route or performance of a third-party sub-contactor's hired driver." (*Id*. at p. 7; *see also id*. at p. 9: "Amazon's involvement was strictly restricted to the tracking of its assets transported by a third-party contractor it understood was undertaken by Transone.").

---

[6] It appears to be undisputed (1) that the Amazon Defendants had no knowledge that the driver carrying Amazon cargo at the time of the accident was directly employed by Right Path rather than Transone and (2) that the Amazon/Transone agreement generally prohibited a double brokered arrangement. (Doc. 114-5 at p. 7, § 14; 114-6 at p. 2, § I.E.2.b.). However, the relevant question for summary judgment purposes is the extent to which Amazon held a right of control over driver conduct—regardless of a driver's direct employer.

The court generally agrees that many of the facts cited by the Amazon Defendants would be insufficient to place the agency issue before a jury—just as the court has found similar facts insufficient as to Transone. But the record contains additional facts about the relationship between the Amazon Defendants and their purportedly independent drivers. Again, the court is not focused on the "what," *i.e.*, the Amazon Defendants' conduct in ensuring that its cargo is timely and safely transported from one location to another, but on the "how," *i.e.*, the Amazon Defendants' conduct in connection with the means and methods of the "what" being carried out. The Amazon/Transone agreement contains much more indicia of control in that regard than the briefing suggests.

First, it appears to be beyond dispute that drivers such as Edwards were required to download an Amazon app in order to access load information. Merely converting a traditionally paper-based process into twenty-first century electronic format cannot be said to transform an independent contractor relationship into one of principal-agent. However, that is not where the evidence shows the functionality of the app to end. Under the terms of the Amazon/Transone agreement, drivers "are expected to use and leave running at all times the Relay mobile application when performing Services," "keep their location sharing as 'Always Allow,'" and "complete all 'events' in the application flow for a Trip in order to earn a Relay mobile application use score for such Trip." (Doc. 114-6 at pp. 3-4 (emphasis added)). The broad scope of that expectation was confirmed in Amazon's sworn deposition testimony:

> Q. And the Relay mobile application is that they're -- drivers are expected to leave their mobile apps on from the time they pick up a load till the time they make a delivery?
>
> A. The expectation is that they do keep the GPS on.
>
> Q. Yeah. And to -- they've got to keep a minimum score of 99 percent?
>
> A. Well, that's what they -- I mean, that's what they agree to in the program policies.

(Doc. 107-4 at p. 13, depo. p. 43).

The Amazon/Transone agreement further makes it clear that the Amazon Defendants can use the Amazon-provided app to "collect personally identifying, location, or other data through this Required Technology" (Doc. 114-6 at p. 9, § IV.C.) and that "data or other information will be collected or generated as your company and its Personnel provide the Services," including "location, movements, speed of travel, and personally identifiable information of your company's Personnel"—all of which the Amazon Defendants reserved the right to "use … and share … with third parties in our discretion." (Doc. 114-5 at p. 6, § 12.b.; *see also* Doc. 107-4 at p. 20, depo. p. 72). To summarize, the record reflects that the Amazon Defendants required independent motor carriers to in turn require their own drivers to use Amazon-provided software that allowed the Amazon Defendants to capture driving data beyond simple delivery confirmation and use all such driving data in furtherance of the Amazon Defendants' business initiatives.

Second, the Amazon/Transone agreement contains certain provisions directly applicable to driving operations. (Doc. 114-6 at p. 5, § II.A.). The most relevant to the agency issue is that portion requiring drivers to "[c]heck all planned routes against commercial navigation technology prior to departure and drive only on roads that permit commercial vehicles." (*Id.* at § II.A.1.c.). Perhaps such a provision would be less significant but for evidence that the Amazon-provided app included a GPS feature and was pre-populated with routes from pickup locations to destination locations. (Doc. 107-3 at pp. 8, 10, depo. pp. 27, 33-34). The court recognizes sworn testimony from the Amazon Defendants that the routes were "optional" and could be ignored:

> Q. Does Amazon provide the driver with a route for him to -- for her to take to make the delivery?
>
> A. Amazon offers, within the Relay app, optional navigation. The driver is free to take whichever route from Point A to Point B and Point C usually that they wish to take. That's completely up to them. We're just the shipper.

(Doc. 107-4 at p. 11, depo. p. 34; *see also id*. at p. 11, depo. p. 36 & *id*. at pp. 18, 32, depo. pp. 61-62, 120). But that testimony must be viewed in combination with the sworn testimony given by Edwards, which provides competing evidence on whether the routes indeed were "optional":

> Q. Okay. When you say everything is recorded through the app, what do you mean by that?
>
> A. With the load. It tracks you from -- you have to press start, like, when you're starting your shift, you press start and the GPS just automatically pops up. And it tells you from point A to point B from point B to point C. It track[s] you everywhere you go.

(Doc. 107-3 at p. 8, depo. p. 25);

> Q. -- you were telling me earlier that there's some kind of GPS and you push start and it tells you the route you're going to take.
>
> A. Yes, sir.
>
> Q. Is that on that Amazon app that you told me about you had earlier?
>
> A. Yes. It's on the app, yes, sir.

(*Id*. at p. 10, depo. pp. 33-34);

> Q. Okay. All right. So say you're driving and you pull off somewhere and you want to get something to eat. You take 30 minutes. Would that --
>
> A. Well, there was a -- there's an update on the app. There's an update on the app that sometimes if you pull over the app would know that you -- you stopped.
>
> Q. Okay.
>
> A. And it would alert them that you stopped.
>
> Q. Okay.
>
> A. And they would call to make sure that everything is okay.

(*Id*. at p. 10, depo. pp. 34-35); and

> Q. You go to your Amazon app and you hit start and it -- GPS program comes up and tells you this is the route you're going to take?
>
> A. Yes, sir.

(*Id.* at p. 10, depo. p. 36; *see also id.* at p. 11, depo. pp. 37-38). The sworn testimony additionally reflects that the Amazon-provided app notified drivers in real time via a "pop up notification" if they were believed to be exceeding the local speed limit. (Doc. 107-4 at pp. 29-30, depo. pp. 105, 110, 112; Doc. 107-3 at p. 31, depo. p. 120: "It would -- it would let you know that, hey, you're over the speed limit, you know, slow down.").

Third, the record contains evidence that the Amazon Defendants reserved the right to provide drivers with safety training: "At any time, and in its sole discretion, Amazon may require that your company and/or its Personnel complete safety training courses and/or trainings specific to working at Amazon facilities or with Amazon technology designated by Amazon to maintain its eligibility to participate in the Program." (Doc. 114-6 at p. 5, § II.A.2. (emphasis added)). Such a reserved right was acknowledged in the Amazon Defendants' sworn testimony:

> A. … So we do retain the right to require specific safety training. But that said, I'm not aware of any time where we have used that. Right?
>
> Q. Okay. But you do reserve the right to do it?
>
> A. Yes, It's in the policy, yes, sir.

(Doc. 107-4 at p. 20, depo. pp. 70-71). Moreover, and even though the Amazon Defendants assert that doing so is entirely "optional" (*id.* at p. 19, depo. p. 67), it is undisputed that Amazon makes safety videos available on the driver app and that Edwards watched a number of those offerings whether officially "mandatory" or not (*id.*; Doc. 107-3 at p. 34, depo. pp. 129-31).

At this stage of the proceedings, the court is required to construe the factual record most favorably to Weldon as the non-movant. *See McCormick*, 333 F.3d at 1243 ("The evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant … ."). Indulging that favorable construction precludes the court from determining as a matter of law that "Amazon's role was, at all times, limited to tracking of its assets under the control of a

contracted carrier and that carrier's compliance with its contracted terms." (Doc. 118 at p. 11). A jury well may so conclude. Yet the court cannot ignore evidence in the record upon which a reasonable jury alternatively could find that the Amazon Defendants' involvement exceeded basic oversight of contractual compliance—especially when a substantial portion of that evidence comes directly from the Amazon Defendants' own contractual terms. *See Waddell*, 276 F.3d at 1279 ("There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."); *Donaldson*, 291 So. 3d at 1176 ("[A]ll features of the relationship are considered together." (citation modified)). Although the facts as to Transone provide an exception to the rule that "[a]gency is generally a question of fact to be determined by the trier of fact," the facts as to the Amazon Defendants do not. *Malmberg*, 644 So. 2d at 890.

## VII. Conclusion

The court recognizes that Transone selected Right Path, that Transone selected the loads for delivery, and that Transone assisted Edwards in onboarding and credentialing to deliver the contracted cargo; but the record lacks sufficient evidence for a jury to conclude that Transone retained enough of a right to control Edwards's actual driving operations to create a genuine dispute of material fact as to the alleged principal-agent relationship. As set out above, the same cannot be said for the Amazon Defendants. So it will be for the jury—not the court—to weigh the competing evidence and determine which is stronger in light of the parties' respective arguments. Accordingly, it is hereby **ORDERED** as follows:

- that the motion for summary judgment filed by Transone Logistics, LLC (*see* Doc. 100) is **GRANTED**; and

- that the motion for summary judgment filed by the Amazon Defendants (*see* Doc. 107) is **DENIED**.

This action now shall proceed against Arnold Edwards on Count One for his alleged negligence and against Right Path Logistics, LLC and the Amazon Defendants[7] on Count Two for whether they can be held liable under a theory of respondeat superior.

**DONE** this the 3rd day of November 2026.

**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**

[7] The parties' summary judgment filings do not make any distinctions among Amazon.com, Inc., Amazon.com, LLC, Amazon.com Services, LLC, and Amazon Logistics, Inc. It is unclear to the court whether each of the entities is a necessary defendant to the particular claim asserted. The parties are directed to confer regarding the potential for voluntary dismissals and/or factual stipulations that would improve trial efficiency and reduce the risk of juror confusion.